Please the court. My name is David Marchese. I represent the appellants John McGlone and Jeremy Peters, and I would like to reserve two minutes for rebuttal. The issue that will be decided by this court is whether a municipality can issue a permit to a private organization that creates for that organization a safe space in the courthouse square where no one who offers a message contrary to their message is allowed. And I argue that the First Amendment does not permit that. That's exactly what happened in this case. Mr. McGlone and Mr. Peters were sharing their religious message in an area that was permitted but not ticketed. It was right outside the festival area. Apparently this is an area that's set up for people to queue up and buy tickets and wait for other people to go into the festival. They were approached and told that they had to leave and go across the street. The only reason that they were given, the only reason that they were ever given for why they had to leave was that the area was permitted. They were told this before the festival even started by Metro Nashville Police Lieutenant, now Captain David Corman. They were told that by Officer Crow, the one who actually moved them at the time, and they were told that by Metro Nashville Police Sergeant Petty after they had moved. Could they have bought tickets to go into the park area? Well, again, presumably they could, but they contacted Metro PD, Lieutenant Corman, before the festival started and told them that they wanted to set up and preach. They were told, no, you have to go across the street. Presumably, if they can't even stand outside a part that's not ticketed, Metro PD would not have been happy with them buying a ticket and actually going inside the festival. Did they indicate that they wanted to use bullhorns? I don't think that they told Lieutenant Corman in their email that they were planning to use bullhorns. I think they told him that they were planning to preach. Would that make a difference, either if they had said they wanted to use bullhorns or if in the past they had used bullhorns? No, it wouldn't have made a difference. They did use bullhorns, and there's no evidence in this case that there was any interference with the message of the festival. And I would point out that the district court itself noted at the hearing on the record, and this is page 799 in the record on appeal, there's no evidence that there was any interference with the actual message of the festival. So clearly, it didn't make a difference that they were using bullhorns in the district court's own view. I argue that this is a viewpoint-specific case. They were moved because their particular viewpoint interfered with the safe space that was created for Nashville Pride. Safe space is not my term. That's Metro's term. Metro contends that this is a time, place, and manner restriction subject to intermediate scrutiny. The restriction here doesn't satisfy intermediate or strict scrutiny. The police here, the government, seems to have been under a mistaken impression, but an impression nonetheless that once you had a permit, that converted public property into private property. So they didn't understand the public forum aspect of the case. They didn't understand the First Amendment. But if they are under a mistaken impression that once you have a permit, the whole permitted area is like your backyard, and you can obviously eject people from your backyard if they're saying things contrary. Somebody shows up in my backyard and says, I hate you. I'm going to ask you to leave. Does that make it content neutral? I mean, if they are under a mistaken impression that a permit makes something private property, can the government be mistaken and use that as a justification? Well, Metro, Sergeant Petty is the one who said a permit creates basically private property. Metro says, well, he was mistaken as to that. There's no indication that Lieutenant Corman, who actually told them they had to leave, was under the impression that it created private property. Now, I think it's telling that no one was asked to leave except for these individuals. Was anyone else actually speaking, though, other than having private conversation or – I mean, I guess delivering – nobody else was there with the purpose of delivering a message. Is that right? No one else was broadcasting a message, but there were sponsor tents set up. Presumably, they had a message that was consistent. I can't find that in the record. I mean, I understand that that's in your brief, but I can't find anywhere in the record that there are sponsor tents set up. Can you – Well, I know that Metro concedes that at the hearing. I don't know if I can give you a site specifically to the record that – So you're saying that Metro conceded that there were sponsor tents. There were sponsor tents, and there is a video that's part of the record as well. Could you have had a competing tent? Well, I would say no, because it would have violated the safe space that supposedly was created by this permit. They were told, you have to go across the street. You, with your contrary message, have to go across the street. So long as your message is consistent, you can set up a tent. That's fine. Everyone else is allowed – But they didn't try to set up – I mean, they didn't try to set up a tent. No, they didn't. They didn't apply. Can we be a vendor? Can we leaflet? Can we have a tent? So I don't know how you can say they were told they couldn't have a tent. That's not in the record. Well, they were told they couldn't be there at all. This, again, Metro concedes this is a traditional public forum. It's not ticketed. It's open to the public. They're in this public area, and they were told, before they even got there, before the festival even started, you can't be anywhere on that side of the street because it's permitted. You have to go across the street. So if they weren't even allowed to stand there, I don't know how they would have been allowed to put up a tent. And again, that's – they didn't try to put up a tent. They just wanted to stand there and share their message. So it's a small area, right, at the entrance to the festival, and that's where they wanted to stand, right? Well, the district court actually said it's a relatively large area. In fact, he said there's plenty of room for them to set up without blocking anyone. He said that on the record at the hearing. And Sergeant Petty also testified there was plenty of room for people to get around without going into the street. So it wasn't – there was not congestion. And again, there's simply no evidence that they were blocking anyone. The district court stated himself there's plenty of room for them not to block anyone. And notably, in the order granting summary judgment, there's no finding of fact by the court that there was any blocking of ingress and egress, that there was any interference with the message, that there was any threat. The concern that I have is that you keep describing things, but with the omission of the bullhorns, of the extreme loudness of the message, as opposed to doing what other people were doing, i.e., you point out the tents. If there had been a request by your side to have tents or to leaflet or to do something like that, and that had been rejected, that would be a different case. But here, your clients were using bullhorns very loudly. And there wasn't anybody else using bullhorns loudly, so far as I could tell, viewing the video. No, no one else was using bullhorns. But I think what's important is, again, there's no – and the district court noted this – there was no – he used the word suggestion. There's not even a suggestion that they were in any way interfering with the message of the festival. Again, they're outside. The festival's going on behind the fenced-in area. And the fact that there's no finding of that in the district court order, granting summary judgment, I think is also – The only response that Metro gave at the hearing when the judge made those statements was, well, they interfered in the general sense with the safe space that was created by the permit, meaning they interfered by offering a contrary message. And again, that's viewpoint. That's a specific viewpoint. That's the most egregious form of content-specific restriction. But, of course, we don't know because no one else was there trying to broadcast a particular message. I mean, it might be a much easier case for you if someone had shown up trying to broadcast a message in favor of whatever, in favor of the festival supporters, and they were allowed to stay and the others were kicked out. That's not exactly this case, right? So it's hard to make the case that this is viewpoint discrimination. Well, Judge Larson and Judge Moore, I think what you're suggesting is, well, wasn't there interference? Because they were using bullhorns. They were being loud. Again, this is a summary judgment case. Where is the evidence of that? Where is the evidence that even using bullhorns, they were interfering with the message of the festival? I don't think this court in SAIG said government interest can't be conjectural. You can't just state this is something that's important in the abstract. It has to be an actual real interest. And if there's no evidence that even using bullhorns, that they were somehow interfering with the message of the festival, then I don't know how you can find that it was. Yeah, so if we leave the bullhorns out of it, I mean, I think that might be right, that this case is distinguishable from the Third Circuit case in which the protesters were drowning out the entertainment acts. They were inside the festival. They were up close to the stage. You couldn't hear the music or the speakers. That doesn't seem to be the case here. But still, the concern is whether or not these people were moved from the sidewalk because they're speaking a message. They're attracting a crowd. The crowd is causing people not to be able to get by. It's creating a hazard. It's blocking entrance. All of that is content neutral, right? It doesn't matter who was it. If I had been standing there saying, you know, if I were a celebrity and I were standing there saying, you know, I'm promoting my new movie about whatever and I was attracting a crowd, maybe I would have been moved off the street, too, because I was so interesting. Well, and again, even if the restriction is content neutral, there's no significant government interest because, again, there's simply no evidence, as the district court itself stated. There's no evidence that they were blocking ingress and egress, threatening public safety, that they were in any way interfering with the message of the festival. If we assume it's content neutral, why wouldn't it be a time, place and manner restriction? And all that your side was asked to do was to move across the street. And then you then you continued with your message, with the bullhorns, with everything. Because there's no significant government interest that was being infringed. There was no interference. They were not interfering with anyone. And in SAIG, this court addressed the issue of whether being able to share your message in another way is that would be the adequacy of alternative channels prong, I assume. In SAIG, the plaintiff was offered, they wanted to hand out leaflets. They were offered a booth to hand out leaflets. In their estimation, that was a less effective means of evangelism, and this court agreed. Here, they were set up, Magone and Peters were set up next to a ramp right at the center. They were allowed to preach way over on the other side of the far end across the street. Well, in their estimation, here they're able to speak to everyone going up the ramp. In the video show, they were on the other side of the railing. There was no impediment. And I think SAIG is on point there. Clearly, that was not an adequate alternative channel of communication. Thank you, counsel. Thank you. May it please the court, my name is Kelly Oliver, and I represent the appellee in this case, the Metropolitan Government of Nashville and Davidson County. The district court correctly held that moving the appellees a few feet across the street and then allowing them to preach their message, including through the use of bullhorns and amplification equipment for four to five hours, according to the appellee's own testimony and deposition, was a reasonable time, place, and manner restriction on their speech. And we would ask this court to affirm that decision. I'd like to start with Judge Larson's point about the fact that what the appellees were told was, you have to move because this is a permitted space. That is absolutely an overstatement of the law under this court's decision in Parks. A permit doesn't turn a public forum into a private forum. But in this case, that overstatement of the law in its application actually does what the First Amendment is aimed to do, which is to balance the interest of two groups with expressive messages within sort of the unique category of permitting scheme cases. The Supreme Court has recognized for years that permitting schemes are one content-neutral way of having order in public forums when you have discordant views that groups on opposite sides want to express. And despite, in their briefing, the appellee's reliance on SAG and Parks and those cases from this court, we submit that this court has never addressed the expressive message versus expressive message problem that we have in this case, except for really in the Sistrunk case, the Sistrunk versus City of Strongsville case, in which this court held that a permittee could make exclusive use of the courthouse square to get its message out in an expressive way and did not have to include someone with a discordant message. And in that case, it was a bush quail rally, there was a young lady who wanted to come wearing a Clinton button, and this court said she can be excluded because the expressive message of this committee in this relatively small public area, which is similar to the relatively small area in the present case, their message is to send out into the world confidence for the bush quail ticket. Let the world know that bush quail is going to win this election, and her button being there is discordant to that. They can exclude her. So is your position that the preachers could be excluded from buying tickets and going into the public park? No, Your Honor, not if they simply walked in. Under the facts of this case, perhaps, because they were actually wearing signs that said that gays were going to hell, that sodomites should repent, and the purpose of this festival is acceptance of the gay community, celebration of the gay community. So if they were wearing a T-shirt that said their message, they could be excluded even if they bought tickets? I believe under Cistron, yes, Your Honor. I believe that they could be refused admission. Now that, of course, is a- Do you have to buy that in order to rule for you? Absolutely not, Your Honor. I think that that is a hypothetical and maybe a case for down the road. Here, there was actually interference, not in the sense of the Startle case where somebody disrupted the acts on stage, but I would submit that this entire permitted area is to celebrate the gay community, to celebrate acceptance of the gay community. And the appellees in this case came with bullhorns and microphones and signs and started preaching immediately that acceptance of the gay community was going to lead you straight to hell. But this was an area outside of the festival itself. Like, there's a gate. You have to get inside. So this is a public sidewalk. I mean, it's a public forum.  No. I'm sorry, Your Honor. No question that it is a public forum. It is part of the permitted space, however, and the purpose, it's- Nashville tries to limit as much as it can blocking off sidewalks and roads because of just the congestion that that causes downtown. And so in order to provide a queuing area, there was this opening in the barricades, and that was sort of just a geographical decision so that the people aren't lining up out in the streets. And I would submit that that's not the kind of distinction that decides this case because while in First Amendment cases you're balancing things all the time, you want to have as many bright-line rules as you can, and the fact that a barricade is not here but it's here, but there's no dispute that this area is permitted and part of the festival. When you say it's permitted, you mean then that the city of Nashville said that the gay pride people had the right to use that sidewalk for their purposes during this event. Is that what you mean? Yes, Your Honor, because in the permit application, you have to actually ask specific permission during that process for use of sidewalks and roads. We had to close a lane, and you have to justify why your footprint is so big that you need a lane closed. And so they asked for that area for queuing up. The pride president stated in his deposition that that was the purpose of that queuing area and that it was to avoid having people queuing out in the street and then closing another lane of traffic. I believe the appellees admitted in their deposition that they knew that that's what that area was to be used for. Was there a tent for purposes of the people who were attending the gay pride events on that sidewalk? Your Honor, there were food trucks on that sidewalk. Food trucks on the sidewalk. Yes, and I don't think anybody testified to that, but in the video, there is that, and there is an area. There is a tent where you could hook up your bike and that kind of thing. Could the preachers have stood on that sidewalk and handed out leaflets there? I believe, Your Honor, that is a closer case. I believe those leaflets said similar to their message, whatever. If it weren't specifically an undermining, competing message of the festival. Wait a minute. Are you saying, so if I'm an Episcopalian minister and I want to stand there and I want to say, God loves all people, we believe in gay marriage, come to my church and get married, that person would be allowed to stay and preach his vision of the gospel and a preacher who comes in and says homosexuality is a sin, they're not allowed. So that's the state's position? Our position, Your Honor, is that if there's a discordant message to the underlying expressive message, then yes, those people can be limited in exactly where they stand. I want to be clear, and I think Your Honor... But you would allow the Episcopalian minister in my hypothetical to stand right there, hand out preachers, have a bullhorn, come to our church, get married, we'll perform your wedding tomorrow, but not the people with a message contrary to that, a different vision of Christianity. That is not... Because I'm thinking that's not just content discriminatory, but viewpoint discriminatory, and that seems tough. And I would say, Your Honor, that again, it's the context of the permit. And in that situation, if there were bullhorns and if people were gathering around and people couldn't get in and there were ingress and egress being blocked, and I would submit that... But couldn't there be ingress and egress being blocked by my Episcopalian minister who's saying, like, you know, come, come, free weddings tomorrow. We're going to waive our fees. Come, sign up. Here we go. We're scheduling people. Everybody's coming. They're like, great, I want to marry my partner. And that person can stay and block all they want, but... I don't think I articulated myself very well. No, that person cannot stay and block all they want. If someone is there with leaflets that say, love Jesus, I think they should be allowed to stay there. I think once you're talking about bullhorns and gathering of people and people not being able to line up, and I would submit that in the video in this case, while the district judge did say it seemed like people could get around, I mean, they could get around, but there was a big crowd and you had to do some maneuvering to get around, whereas the purpose... The key, really, to your position is the use of the bullhorns and causing a crowd to form and that that would apply no matter what the message of the bullhorns would be. I think that is the first prong of our message. And then the second prong is that this case, the case of CISDRUNK, is really the most on-point case in the Sixth Circuit, even though it was a political rally case that says a group that gets a permit has a right to exclusive control of an area to express their message. And this certainly was a discordant view to that message and undermined the entire expressive message of the festival, which is that this traditionally marginalized group of society could come and celebrate being who they are. Is it the bullhorns that are the problem? So if I stood out there and I said, sign up for my low interest rate credit card and I'll give you a free T-shirt, and everybody's like, great, I want the free T-shirt and the credit card and I've got my bullhorn and it's loud and I'm attracting a crowd and maybe you can't hear back in the festival, although there's no indication here that this message was blocking out speakers inside. Can I stand there and advertise my credit card? Everybody is welcome. I welcome all people to apply for my credit card and I'll give you a T-shirt. I don't think once you start attracting a crowd and making an issue with ingress and egress to the festival, you'll be allowed to stand there. That's a different case than here. There are noise ordinances, which is not an issue in this case, but things like that that could come into play. Well, it's not the bullhorn, or it is the bullhorn that, well, it's the crowd that's the problem. It's not the bullhorn. If I stood out there with my bullhorn and I said, it's raining today, it's raining today, it's raining today, and the sun is shining, everybody would just ignore me and think I was a crazy person and walk by. So it's not the bullhorn. It's the crowd forming, and that goes to time, place, and manner. Sorry, Your Honor. Yeah, no, I'm just trying to get a handle on it. It's three things. First, it's that National Pride had a permit for exclusive use of this area to promote their message, and under CISDRUNK, they could exclude discordant speakers. It's also, on the realities of this case, if you just sort of want to get away from the academic law, because First Amendment cases have to be fact-specific in a lot of instances, you also not only have a message that undercuts pride's expressive message, you have it through amplification equipment, and you have it through incendiary language that is broadcast very loudly in a group that is, quite frankly, if you watch the video, I submit designed to draw an incendiary crowd. You have it happening at an area that has been set up, part of the permitted festival, to allow people to not have to line up in the street, and if you watch the video at minute five, the people that engaged with the Applees are people who are in line to go to this festival. So I would submit that they were at least distracted from their expressive purpose by the Applees in this case. And at the end of the day, the evil that... The distraction wasn't enough? No, Your Honor, certainly not. But this notion that people were just standing around doing nothing and that there's no indication that they were actually people participating or wanting to participate in the festival, I think is belied by the video. The people that... The point of the First Amendment to allow people to convince other people that their message is a good message? I think that the evil that the First Amendment is aimed at avoiding is the preclusion of someone's message, and that didn't happen here. Those street preachers were moved first across the street from where they had begun, and then ended up, if you watch the video at the hour 24 mark and onward, they're at the very edge of the other side of the festival, on the Third and Union side, and they are communicating to their exact intended audience. It's festival goers who've come out, who are using a crosswalk to go back and forth. They engage them, they talk to them. Their complaint in this case is, or in the briefs, is that they didn't get to reach their intended audience, and that's why they are upset with having been moved ten feet away in some cases. But if you watch the video, they reached their intended audience. And at the end of the day, I don't think that the First Amendment gives you the right to stand exactly where you want to stand, so long as you have other ample alternative avenues of communication, and they certainly did in this case. And finally, Your Honors, I would just submit that even if the moving of the athletes across the street was inappropriate, there's no evidence in the record that it was the result of a municipal custom, policy, or practice for purposes of Section 1983 liability. The athletes rely solely on an email from then-Lieutenant, now-Captain David Corman, telling them they need to be across the street. Under this Court's precedent, state law tells you who is a policymaker for 1983, and a police lieutenant is certainly not that. There's no evidence in the record that the chief of police, or the mayor, or any policymaker had any knowledge, had given any directives, or even had any knowledge of this instance at the 2015 Pride Festival, and the record is replete with the athletes' own testimony that their relationship with the Metro Nashville Police Department is overall a positive one, that on multiple occasions their First Amendment rights have been protected by the Metro Nashville Police Department, and I would submit that even if this particular festival wasn't handled appropriately, an email from a lieutenant is certainly not enough to hold the city liable. Did he have the authority to tell people, the preachers, where they could or could not be? I think he had the authority to say his interpretation of the permit, but I still don't think that he, if his interpretation is wrong, I don't think that that equates to a city policy. I think there needs to be something more, Your Honor. Do Your Honors have no more questions? We do not. Thank you, Counsel. Mr. Bottle? Thank you. First of all, this case is not cis-drunk. Cis-drunk was not a time, place, and manner case. Cis-drunk is a rare case where they actually address viewpoint, and the point of cis-drunk is you cannot force someone else to express your viewpoint. This is a person who wanted to participate in that case, Cites Hurley, another similar Supreme Court case. They wanted to participate in the speech of the people conducting the rally. That's not the case here. There's no question that McGlone and Peters were not a part of the festival. So cis-drunk, again, that to me indicates that this is about viewpoint. Secondly, again, the concern with the Bullhorns, there was no attempt ever to narrowly tailor. I guess this would be the narrow tailoring prong. Again, they were told before they even got there. Lieutenant Corman didn't know they were going to have Bullhorns. They were told you cannot be on that side of the street because it's permitted. They were not told shut off your Bullhorns or reduce your volume. There was no attempt ever to try to somehow narrowly tailor. Move over here because you're blocking. Nothing. They were told, consistent with what they were told before they got there, you have to go across the street. And as to the question of whether there's a state policy, this case is all about the permit. They keep talking about the permit. The permit was issued by Metro Nashville. The guidance and the owner of Comprehensive, Lloyd Poteet, said he receives guidance from Metro Nashville Police Department as to what's allowed at the festival. That guidance was given by Lieutenant Corman, who oversees special events for the police department. Does he have the authority to set policy? He did set the policy here by giving that directive. He was on the committee that approved the permit. He is listed as a contact person for any questions about the security action plan, which was also approved by Metro. Metro can't tell Comprehensive, these people have to be across the street. And then when Comprehensive moves them across the street, say, well, that wasn't us, that was Comprehensive. This is all about, and I would direct you to this court's decision in Parks, where this court said the city instituting a permitting scheme that ostensibly gave the permit holder authority to move people was, in fact, the action of the city. They also had a letter in that case from the city attorney. Whether a city attorney can enact policy, I would certainly question. This court found it persuasive that the city attorney justified the removal of Mr. Parks and considered that to be state action as well. Thank you, counsel. The case will be submitted. Court may call the next case.